No. 90,273
90,876

IN THE MATTER OF THE MARRIAGE OF JACQUELINE KAY
SHEVLING, *Petitioner/Appellant,* and HARLEY EUGENE
SHEVLING, *Respondent,* v. JUDITH A. SHEVLING, *Intervenor/
Appellee.*

(97 P.3d 1036)

Opinion filed September 24, 2004.

*J. Donald Lysaught, Jr.,* of Higgins, Lysaught, Tomasic & Lynch, Chartered, of Kansas City, argued the cause and was on the briefs for the appellant.

*Gerald N. Jeserich,* of Law Offices of Gerald N. Jeserich, of Kansas City, argued the cause and was on the brief for the appellee.

The opinion was delivered by

LUCKERT, J.: This is a dispute between an ex-wife and the second wife over federal survivor benefits. The ex-wife had been awarded a percentage of the benefits as part of a property settlement agreement at the time of divorce. The husband subsequently tried to change the beneficiary when he remarried but his request was denied by the Merit Systems Protection Board. Following husband's death, the second wife filed this action as a postdivorce motion to intervene. The district court ordered the ex-wife to pay a portion of the survivor benefits to the second wife. The ex-wife refused to comply and was found in contempt of court. She appeals.

*Facts*

Jacqueline Kay Shevling (Kay) and Harley Eugene Shevling (Gene) divorced in 1985 after 25 years of marriage. Their Property Settlement Agreement (PSA), which was incorporated into the di-

vorce decree, provided that Gene would allocate to Kay "the maximum survivor annuity" under his Civil Service Retirement. Gene's retirement benefits accrued while Gene was working for the federal Food and Drug Administration where he was employed during his marriage to Kay and after the divorce until his retirement.

On the same day that Gene and Kay signed the PSA, they also signed an agreement stating that, in the event Gene retired or remarried, Kay agreed to modify the original divorce decree so that, rather than receiving full survivor benefits, she would receive an amount at least equal to 55% of a base rate of $5,000 per year. This separate agreement was not attached to or filed with the original divorce decree and PSA.

Kay testified that she agreed to sign the separate agreement because Gene was refusing to sign the original PSA unless she agreed to the change. Kay was getting ready to leave for a job in Europe and the divorce had already "dragged out for a year." Kay realized she was giving up the maximum survivor benefits and would only receive $200 per month if Gene retired or remarried, but she was "desperate for a divorce."

Kay also testified that Gene told her the reason he wanted to reduce her survivor benefits was that giving her the maximum survivor benefits would reduce the amount of benefits he would receive when he retired.

Gene retired in 1989 and shortly thereafter realized that the Office of Personnel Management (OPM) was calculating his benefits based upon full survivor benefits to Kay rather than partial survivor benefits as contemplated by his June 1985 agreement with her. He wrote to the OPM about this perceived mistake. OPM responded that it was calculating Gene's benefits correctly based upon the divorce decree which provided for full survivor benefits to Kay and that Kay's notarized letter documenting her agreement to a lesser amount of benefits was not sufficient.

Gene then provided OPM with an agreed court order, signed by Kay and filed on June 18, 1990, which purported to correct the original PSA and reflected the parties' separate agreement wherein Kay agreed to the reduction in her survivor benefits. The agreed order stated that the parties had intended to incorporate the sep-

arate agreement into the original PSA but had failed to do so as a result of inadvertence or mistake.

In September 1990, Gene married Judith Shevling (Judy). Gene attempted to elect full survivor benefits for Judy with the exception of that portion allocated to Kay under their agreement. OPM informed Gene that, under federal law, it must honor the provisions of Gene and Kay's divorce decree and not the agreed order modifying the divorce decree because that order was not filed until after Gene's retirement. Thus, Kay was entitled to the maximum survivor annuity and Judy was entitled only to a contingent survivor annuity, *i.e.*, if Kay died or remarried.

Gene appealed OPM's decision to the Merit Systems Protection Board which affirmed OPM's decision. Kay attempted to assist Gene in the appeal process by writing a letter to the Board affirming that, at the time of the divorce, she had agreed to receive reduced survivor benefits in the amount of approximately $200 per month. Gene did not further appeal the Board's decision.

When Gene died in April 2001, the government began sending full survivor benefits to Kay. In August 2001, Judy filed a motion to intervene in Gene and Kay's divorce seeking to enforce the prior agreement regarding the survivor benefits. One month later Judy filed a limited actions petition in which she alleged that Kay "had agreed and promised in writing and orally that the Plaintiff would be entitled to the death survivor benefits of Harley Eugene Shevling." The actions were consolidated.

After an evidentiary hearing, the district court ruled that Kay was bound by her agreement with Gene to waive all but 55% of the base rate of $5,000 in survivor benefits. The court found the fact that the federal government could not make the payments in the manner the parties had agreed did not excuse Kay from following the agreement. Accordingly, the court ordered Kay to pay Judy all but $229.17 per month of the survivor benefits she was receiving. The court also awarded Judy a money judgment of $17,504 for accrued past payments. Kay filed a motion for reconsideration which the court ultimately denied in January 2003. On January 7, 2003, the district court filed an amended journal entry of judgment, from which Kay timely appeals.

In April 2003, Judy filed an accusation in contempt alleging that Kay had refused to abide by the district court's order and had taken affirmative steps to hide assets and income. The district court held a contempt hearing and, on June 26, 2003, ruled that Kay was willfully violating the court's order by failing to send Judy her portion of the survivor benefits. The court found Kay to be in contempt of court and sentenced her to jail until she complied with the court's order. The court stayed execution of the jail sentence until July 7, 2003, in order to give Kay the opportunity to purge herself of contempt by complying with the court's order.

The case was transferred to this court on its own motion pursuant to K.S.A. 20-3018(c).

*Was the Second Wife a Third-Party Beneficiary of the Agreement Between the Ex-Wife and Husband?*

Although the parties raise several issues, we begin our analysis with the one critical to Judy's ability to recover. Judy, according to her motion, sought intervention in the divorce action "for the purpose of enforcing certain amendments to the Decree of Divorce and Property Settlement Agreement that were to benefit the proposed intervenor." Judy argues that she was a donee beneficiary (one of three classes of third-party beneficiaries) and the only possible intended beneficiary of Gene and Kay's agreement. Kay responds that Judy was not an intended beneficiary and has no right to enforce the contract.

First we must consider a procedural argument. Judy contends that Kay never raised the defense that Judy was not a third-party beneficiary before the district court, thus she has waived it. This is inaccurate. In Kay's "Answer in Opposition to Motion of Intervenor for Judgment Against the Petitioner," Kay alleged that "any agreement by and between the parties to this divorce did not contemplate provisions for the care and comfort of some future surviving spouse." Although it appears counsel did not argue the issue during the hearing, Kay also raised the issue in her motion for reconsideration.

Thus, we will consider the substance of Kay's assertion that because Judy was only an incidental beneficiary of the 1985 agree-

ment between Gene and Kay, she had no standing to bring an action to enforce that agreement.

This court gave an extensive recitation of the law regarding third-party beneficiaries in *Martin v. Edwards*, 219 Kan. 466, 548 P.2d 779 (1976):

"Generally, where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration [citations omitted]. But it is not everyone who may benefit from the performance of a contract between two other persons, or who may suffer from its nonperformance, who is permitted to enforce the contract by court action. Beneficiaries of contracts to which they are not parties have been divided into three classes: Donee beneficiaries, creditor beneficiaries and incidental beneficiaries. Only those falling within the first two classes may enforce contracts made for their benefit (17A C.J.S. Contracts § 519(4) b., p. 964; Accord: *Burton v. Larkin*, [36 Kan. 246, 13 Pac. 398 (1887)]). These third person beneficiaries are defined in 2 Williston on Contracts, 3d ed., § 356, as follows:

'. . . (1) Such person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof, is to make a gift to the beneficiary, or to confer upon him a right against the promisor to some performance neither due [nor supposed] or asserted to be due from the promisee to the beneficiary; (2) such person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and performance of the promise will satisfy an actual [or supposed] or asserted duty of the promisee to the beneficiary; (3) such person is an incidental beneficiary if the benefits to him are merely incidental to the performance of the promise and if he is neither a donee beneficiary nor a creditor beneficiary.' (pp. 824-827.)

"(Accord: Restatement of the Law of Contracts, § 133, pp. 151-152. Restatement, Contracts, 2d, Revised Tentative Draft, 1973, § 133, pp. 285-286, divides contract beneficiaries into the classes—intended and incidental).

"The rule respecting incidental beneficiaries is stated in 17 Am. Jur. 2d, Contracts, § 307, as follows:

'. . . A mere incidental, collateral, or consequential benefit which may accrue to a third person by reason of the performance of contract, or the mere fact that he has been injured by the breach thereof, is not sufficient to enable him to maintain an action on the contract. Where the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach. . . .' (p. 733.)

"Various tests have been used elsewhere in drawing the line between classes of beneficiaries. In *Burton v. Larkin*, supra, this court held: 'It is not every promise made by one to another from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to

the contract nor to the consideration. *The contract must be made for his benefit as its object, and he must be the party intended to be benefited in order to be entitled to sue upon it.'* (Syl. para. 3.) (Emphasis supplied.) Under this test a beneficiary can enforce the contract if he is one who the contracting parties intended should receive a direct benefit from the contract [citation omitted]. We think this test is sound and are content to reaffirm it. Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract [citation omitted]. It is not necessary, however, that the third party be the exclusive beneficiary of all the promisor's performance. The contract may also benefit the contracting parties as well (17 Am. Jur. 2d, Contracts, § 306, pp. 731-732; 17A C.J.S. Contracts § 519[4] f., p. 983).

"The determination of the intent of the contracting parties as to rights of a third party beneficiary is a question of construction for the court and the general rules for the construction of contracts apply. The intention of the parties and the meaning of the contract are to be deduced from the instrument where its terms are plain and unambiguous [citation omitted]. However, facts and circumstances surrounding its execution become competent in the event the instrument is ambiguous on its face and requires aid to clarify its intent." 219 Kan. at 472-74.

Kay points out that Judy was not an intended beneficiary because, at the time of the agreement in 1985, Judy was "not even in the picture." Kay testified that Gene did not know Judy at that time, to her knowledge. According to Kay, the reason Gene wanted to reduce Kay's survivor benefits was to increase the amount of benefits Gene would receive.

Under the federal pension benefit system, the retirement annuity is reduced to allow for a survivor annuity if at the time of retirement the employee is married, unless both parties sign a waiver, or if a former spouse is entitled to the survivor annuity under a divorce decree. 5 U.S.C. § 8339 (2000).

Under 5 U.S.C. § 8341(h)(1) (2000), a former spouse of a deceased retiree is entitled to a survivor annuity "if and to the extent expressly provided for . . . in the terms of any decree of divorce or annulment or any court order or court-approved property settlement agreement incident to such decree." However, subsection (h)(4) of the same statute further provides:

"[A] modification in a decree, order, agreement, or election referred to in paragraph (1) of this subsection shall not be effective —
(A) if such modification is made after the retirement or death of the employee or Member concerned, and

(B) to the extent that such modification involves an annuity under this subsection."

The Merit Systems Protection Board relied on the above provisions in determining that Kay was entitled to a full survivor annuity. In addition, the Board cited a regulation then in effect, 5 C.F.R. § 831.1704(e) (1989), captioned "Qualifying court orders." The subject matter of that regulation is now covered by 5 C.F.R. § 838.1004 (2003), which provides in relevant part:

"(e)(1) For purposes of awarding, increasing, reducing, or eliminating a former spouse survivor annuity, or explaining, interpreting, or clarifying a court order that awards, increases, reduces or eliminates a former spouse annuity, the court order must be —
(i)   Issued on a day prior to the date of retirement or date of death of the employee; or
(ii)   The first order dividing the marital property of the retiree and the former spouse.
. . . .
"(e)(3) In paragraphs (e)(1) and (e)(4) of this section 'issued' means actually filed with the clerk of the court, and does not mean the effective date of a retroactive court order that is effective prior to the date when actually filed with the clerk of the court (e.g., a court order issued nunc pro tunc).
"(e)(4)(i) In paragraph (e)(1)(ii) of this section, the 'first order dividing the marital property of the retiree and the former spouse' means-
(A) The original written order that first ends (or first documents an oral order ending) the marriage if the court divides any marital property (or approves a property settlement agreement that divides any marital property) in that order, or in any order issued before that order; or
(B) The original written order issued after the marriage has been terminated in which the court first divides any marital property (or first approves a property settlement agreement that divides any marital property) if no marital property has been divided prior to the issuance of that order.
(ii) The first order dividing marital property does not include —
(A) Any court order that amends, explains, clarifies, or interprets the original written order regardless of the effective date of the court order making the amendment, explanation, clarification, or interpretation; or
(B) Any court order issued under reserved jurisdiction or any other court orders issued subsequent to the original written order that divide any marital property regardless of the effective date of the court order."

The language of the above statute and regulation makes clear that OPM correctly applied federal law in determining that the 1990 order purporting to modify Gene and Kay's original divorce

decree and property settlement agreement was not effective to reduce Kay's survivor annuity because the order was filed after Gene's retirement in 1989 and the order was not the first order dividing marital property.

The parties cite no authority and we find none establishing that OPM would allow an employee to adjust the amount of benefits received by the employee/member or the survivor annuitant. See 5 U.S.C. § 8339(j)(4) (specifying reduction in pension if survivor annuity). But, even if Kay and Gene's contract was enforceable, the result would have been that Gene would have received more during his lifetime and Kay would have received less as a survivor. This also means that if Judy begins to receive her contingent survivor benefit should Kay remarry or predecease Judy, Judy will receive more than she would have had the survivor benefit been reduced and Gene received a larger retirement benefit.

Under these circumstances, Judy is an incidental, rather than an intended, third-party beneficiary of Gene and Kay's 1985 agreement. As such, she has no ability to enforce that agreement.

Although it is mentioned only in passing in Judy's brief, Judy does point out that the district court made some findings regarding a conversation between Kay, Gene, and Judy in 1995 after Gene's retirement and marriage to Judy. According to Judy, the three of them had a telephone conversation wherein Kay promised to send Judy the payments Kay received from the government. Kay admitted that the telephone call took place, but did not recall having agreed to share the benefits with Judy. Regarding the conversation, the district court stated: "Certainly, I think it's more probably true than not that she had the telephone conversation . . . , *but whether that happened or not really doesn't matter.*" (Emphasis added).

The court made no findings regarding whether this conversation constituted an enforceable contract, specifically whether there was a meeting of the minds as to the terms of or consideration for the oral agreement. Judy did not ask the district court to make specific findings regarding the alleged oral contract. Nor has Judy presented any argument, either before the district court or on appeal,

that the conversation is an alternative basis for the district court's determination.

A point incidentally raised but not argued is deemed abandoned. *Varney Business Services, Inc. v. Pottroff,* 275 Kan. 20, 40, 59 P.3d 1003 (2002).

Thus, we hold that under the facts of this case, Judy has not established a contract between her and Kay nor one to which she was a third-party beneficiary entitled to enforce the contract.

Consequently, we do not reach the other issues raised by the parties regarding whether federal law preempted the court's order; whether the federal board's order was binding upon Judy on the basis of estoppel, waiver, laches, or acquiescence; whether Judy's claim was barred by duress or fraud; whether the statute of limitations had expired; whether equity should be invoked; and whether the district court exceeded its authority in finding Kay in contempt.

Reversed.